UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ADVANCED RADIANT SYSTEMS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | No. 1:14-cv-01943-JMS-DML |
| | ) | |
| PEERLESS INDEMNITY INSURANCE COMPANY, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Presently pending before the Court in this insurance coverage dispute are cross-motions for summary judgment filed by Plaintiff Advanced Radiant Systems, Inc. ("ARS"), [Filing No. 46], and Defendant Peerless Indemnity Insurance Company ("Peerless"),[1] [Filing No. 53].  For the reasons that follow, the Court grants in part and denies in part ARS's request for summary judgment and denies Peerless' request for summary judgment.

**I.**
**STANDARD OF REVIEW**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear, whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or

---

[1] Peerless is a wholly-owned subsidiary of Liberty Mutual, and Liberty Mutual "adjusted the loss" at issue in this litigation.  [Filing No. 48 at 2.]  The parties make no distinction between Peerless and Liberty Mutual other than to specify for which entity certain individuals involved with the insurance claim at issue herein worked.  The Court will do the same.

1

affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657

F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

"The existence of cross-motions for summary judgment does not, however, imply that there are no genuine issues of material fact." *R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engineers*, 335 F.3d 643, 647 (7th Cir. 2003). Specifically, "[p]arties have different burdens of proof with respect to particular facts; different legal theories will have an effect on which facts are material; and the process of taking the facts in the light most favorable to the non-movant, first for one side and then for the other, may highlight the point that neither side has enough to prevail without a trial." *Id.* at 648. Put another way, cross-motions for summary judgment do not waive the right to a trial and, instead, are treated separately. *McKinney v. Cadleway Properties, Inc.*, 548 F.3d 496, 504 (7th Cir. 2008).

## II.
### BACKGROUND

The following facts are undisputed, unless otherwise noted. ARS was founded in 1991 and "is in the business of fabrication, assembly and distribution of specialized heating units (radiant) and cooling units (air evaporators) to a wide customer base, including retailers, end users, government facilities and others." [Filing No. 46-1 at 2.] It is a family-owned and operated business—Mike Hale ("Mike") serves as the CEO, Jeanette Hale ("Jeanette") serves as the CFO, and their son Mike C. Hale ("Craig") is primarily responsible for acquiring ARS's major projects. [Filing No. 46-1 at 1-3.] ARS's business tends to be cyclical, depending on the seasons and other

weather-related events that affect sales and demand for its products and services.  [Filing No. 46-1 at 2.]  ARS typically ramps up its sales and distribution efforts for the heating season around August and for the cooling season around March.  [Filing No. 46-1 at 2.]  Given its cyclical nature, ARS's cash flow is "not straight line."  [Filing No. 46-1 at 2.]  Major projects can also affect its cash flow, given that the work can be received in one calendar year but the revenue from the project may not be collected until the project is completed in another calendar year.  [Filing No. 46-1 at 2.]

As ARS acquired more major projects, the expanded operations strained the "capabilities and capacity" of ARS's Fishers headquarters on Ford Drive ("Ford Drive facility" or "Ford Drive").  [Filing No. 46-1 at 3.]  Mike "knew it was inevitable, given the history, that [ARS] would outgrow Ford Drive," so in May 2011, ARS acquired some temporary lease space at a warehouse on Cumberland Road in Fishers ("Cumberland facility").  [Filing No. 46-1 at 3.]  Mike searched for a permanent future site and found a ten-acre site in Fortville (the "Fortville property" or "Fortville") that was previously operated as a chemical mixing facility but had been dormant for years.  [Filing No. 46-1 at 3.]  It was purchased in April 2012 as ARS's future site.  [Filing No. 46-1 at 4.]  At the time of purchase, the Fortville property contained five buildings—a modular double wide by the driveway entrance; a small cinder block building to the near east; a small warehouse building to the near southeast; a shower house building to the north; and a large production office facility to the east.  [Filing No. 46-1 at 4.]  At the time of purchase, Mr. Hale planned to either move or tear down four of the five buildings on the Fortville property.  [Filing No. 52-1 at 5.]

Mike worked with Bruce Klineman of the insurance agency Assured Neace Lukens ("Neace Lukens") to insure the Fortville property.  [Filing No. 46-1 at 4.]  Ultimately, the Fortville

property was insured under the same policy as ARS's Ford Drive facility.  [Filing No. 46-1 at 4.]
The relevant portion of ARS's insurance policy for purposes of this action provided ARS with
business income coverage in the event of an interruption in business.  [Filing No. 46-6; Filing No.
46-7 (endorsement updating business income coverage).]

On May 17, 2012, a fire started at ARS's Ford Drive facility, resulting in a total loss of the
building and its contents.  [Filing No. 46-1 at 4.]  ARS made an insurance claim with Peerless and
resumed the administrative side of the business from the Hales' homes.  [Filing No. 46-1 at 4.]
For four or five months following the fire, ARS operated its production out of the Cumberland
facility.  [Filing No. 52-1 at 8.]

Anthony DeCesare, a Liberty Mutual insurance adjuster based in Louisville, was assigned
to ARS's claim.  [Filing No. 46-1 at 5.]  Mike "explained to Anthony that it would be in the best
interests of ARS and Liberty to focus on an accelerated path to address renovation and re-location
to Fortville, rather than move to 'temporary quarters' that would require expense, but no long run
return."  [Filing No. 46-1 at 5; Filing No. 46-2.]  Beginning in June 2012, the Hales and their new
comptroller Dave Youngcourt were "primarily directed at the preservation of business, the rebuild,
and the multitude of details that accompany an effort to start over from scratch . . . ."  [Filing No.
46-1 at 5.]

Mike sent Mr. DeCesare an email on June 22, 2012, noting that the "[c]urrent shared
offices, as well as the three separate locations of staff, are creating unforeseen inefficiencies."
[Filing No. 46-2.]  Mike told Mr. DeCesare that the current conditions were "far less than optimal"
and would continue to be a financial burden "until the entire business operation is functioning in
a single location."  [Filing No. 46-2.]  Mike noted that although more money "could be spent on
additional temporary space . . . it would better serve ARS and the insurer should the decision be

made to focus those resources on expediting the occupancy of ARS's future permanent location at 315 North Madison Street in Fortville, IN." [Filing No. 46-2.]  Mike concluded that "[s]hould it be determined that this is not an appropriate course of action[,] ARS will need to immediately begin to seek additional space to help manage the overlap . . . ." [Filing No. 46-2.]  Mike attests that Mr. DeCesare agreed with his proposed plan.  [Filing No. 46-1 at 5.]

ARS "decided to spend some of the insurance money to put the modular office and cinder block building [in Fortville] in shape for 'human habitation.'" [Filing No. 46-1 at 5.]  Mike attests that those offices "were never to be a permanent location" and that he never told anyone that they would be.  [Filing No. 52-1 at 10.]  He contends that the ultimate plan was to move the modular house to another location and not to use the cinder block building as part of ARS's operation at all.  [Filing No. 52-1 at 10.]

In early August 2012, ARS received notice from the Cumberland facility landlord that the landlord was terminating ARS's month-to-month lease because it had found a permanent tenant. [Filing No. 46-1 at 6.]  Because ARS needed to move out of the Cumberland facility where its production was set up, Mike "scrambled to get work started immediately on the Fortville east building . . . ." [Filing No. 46-1 at 6.]  Mike attests that "this was a 'temporary' fix until [he] could complete the planning for code compliance and build out of the east building and move everyone back under one roof." [Filing No. 46-1 at 6.]

ARS's production moved to the Fortville property on October 31, 2012. [Filing No. 46-1 at 6.]  By that date, ARS also had its administrative personnel working out of the modular building and its accounting personnel working out of the cinder block building in Fortville. [Filing No. 46-1 at 5-6.]  Thus, the parties do not dispute that all of ARS's operations were located in various buildings on the Fortville property as of November 1, 2012. [Filing No. 52-1 at 12 (Mike's

6

testimony confirming interrogatory answer that "the business was resumed at the new owned location 100 percent [as] of November 1, 2012"); Filing No. 52-1 at 19 (Mike's testimony that as of November 1, 2012, ARS's business was 100% resumed "[a]t the Fortville location . . . spread out in all the buildings") (referencing Filing No. 52-4 at 1).]

Because of the varied locations of the buildings on the Fortville property, ARS employees were not able to easily share information.  [Filing No. 46-4 at 2.] They "tried stringing cable for computers and telephones, but were never able to work out the bugs.  People were running back and forth between buildings, using scooters and other methods to keep things going." [Filing No. 46-1 at 6.]  ARS had to install separate Internet feeds to the buildings, which did not allow it to operate from the same server.  [Filing No. 46-4 at 2.]  ARS tried several different types of radios to address the communications problems, but the radios did not work inside the modular office. [Filing No. 46-4 at 2.]

The insurance policy provides that Peerless "will pay for the actual loss of Business Income you sustain due to the necessary 'suspension' of your 'operations' during the 'period of restoration.'" [Filing No. 46-6 at 1.]  The parties do not dispute that ARS is entitled to some business income coverage pursuant to the policy as a result of the Ford Drive fire.  The parties also do not dispute the method of establishing the appropriate loss of business income.  [Filing No. 46-4 (email from Mike to Mr. DeCesare after meeting in June 2014 stating that "[t]he one thing I do believe we all agreed on is the accounting method used by Ms. Mary Anne Mull of [Liberty Mutual] and Somerset CPA's in establishing the loss of income").]

The parties do dispute, however, the appropriate end date for the "Period of Restoration" (also referred to as "POR") used to calculate ARS's business income coverage.  The policy and

applicable endorsement at issue provide that the Period of Restoration for business income coverage

> [e]nds the earlier of:

> > (1) The date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality;

> > (2) The date when business is resumed at a new permanent location; or

> > (3) Twelve consecutive months after the "suspension" of your "operations."

[Filing No. 46-7 at 2 (modifying definition of "Period of Restoration" set forth at Filing No. 46-6 at 8).] "Suspension" is defined, in relevant part, as "[t]he slowdown or cessation of your business activities." [Filing No. 46-6 at 9.] "Operations" is defined, in relevant part, as "[y]our business activities occurring at the described premises. . . ." [Filing No. 46-6 at 8.] The parties have not pointed to a definition for "new permanent location," as that phrase is used in defining the Period of Restoration end point.

Peerless relies on subsection (2) of the policy's definition of the Period of Restoration end date and contends that because all ARS operations were located at the Fortville property as of November 1, 2012, that is the applicable end date. ARS contends that its set up on the Fortville property was completely temporary as of that date, and that the Fortville property could not be considered its new permanent location until a date more than twelve consecutive months after the fire at the Ford Drive facility. [*See* Filing No. 46-1 at 8 (Mike's affidavit attesting "ARS did not occupy its 'new permanent home,' bringing all phases of operations 'under one roof' until January 2015").] Thus, ARS relies on subsection (3) of the policy's definition of the Period of Restoration end date and argues that Peerless must provide it with business income coverage for all twelve consecutive months following the Ford Drive fire. [Filing No. 46-4 at 2.]

After it became apparent that the parties disputed the Period of Restoration end date, Mike retained Somerset CPAs ("Somerset") Steve Riddle and Chris Hirschfeld to look into the claim and loss analysis. [Filing No. 46-1 at 7.] After some back and forth with Liberty Mutual's internal CPA Mary Ann Mull, a meeting was held at Somerset's Indianapolis office on June 17, 2014. [Filing No. 46-1 at 7.] Mike, Jeanette, Mr. Riddle, Mr. Hirschfeld, Neace Lukens insurance agent John French, Ms. Mull, and Mr. DeCesare were at the meeting. [Filing No. 46-1 at 7.] Numerous issues were discussed, including the proper method of accounting ARS's business income loss, the proper Period of Restoration end date, and whether Mike knew that moving all of ARS's operations to the Fortville facility, even into temporary structures, could terminate the Period of Restoration. [Filing No. 52-5 at 8-10.]

The parties dispute whether Mike knew that if ARS moved all of its operations to the Fortville location, Peerless would consider that to be the end of the Period of Restoration for purposes of the business income coverage. Mike contends that he never "impl[ied] to anyone that the modular office was anything more than a 'temporary' location." [Filing No. 46-4 at 1; see also Filing No. 46-1 at 6 (Mike's affidavit).] To the contrary, Mike attests that he "distinctly recall[s] telling Anthony that until we solved our problems and got everyone under one roof, everything was still temporary." [Filing No. 46-1 at 6.] Mike attests that had he known that moving ARS's operations from Cumberland to Fortville would have constituted the Period of Restoration end date, he "would never have moved." [Filing No. 52-1 at 10.] Mr. DeCesare disagrees, and testified that Mike was well aware of the consequence of moving all of ARS's operations to Fortville:

> I had met with [Mike] and his agent on site. I don't remember the address of the location, but it was the ultimate location for his permanent move. This was openly discussed. There w[ere] no surprises. They knew—Mr. Hale knew that whatever decision he made that he thought was best for his business would terminate the period of restoration at the time that he moved into his new location. He was

9

thoroughly advised of it. He knew it. The agent knew it. It was openly discussed. It was months before the ultimate move was made.

At the same time there w[ere] offers to do whatever we had to do for with respect to assisting with the temporary operations and locations that he had selected. So basically, when Mr. Hale made the decision to build out to move, he did it with full knowledge that it would terminate the period of restoration when he effected the move, which in this case was, I believe, on or before November 1st . . . . So it wasn't a surprise. It wasn't something that I just on November 1st said, guess what? The period of restoration is over. This was well thought out and planned by Mr. Hale. He did it with full knowledge.

It became an issue later after—and I don't remember months, a year. It was later down the road when it was, the whole situation had been reopened. And I don't recall if it was at the specific request of the agent or Mr. Hale or his accountants. And that's the reason why it was an issue.

[Filing No. 52-5 at 7.]

On July 28, 2014, Liberty Mutual sent a letter to Mr. Hale, informing him that it would pay ARS $185,027.82 pursuant to the business income coverage based on its conclusion that ARS had resumed its business at a new permanent location on October 31, 2012.[2] [Filing No. 46-8 at 4.] It rejected ARS's position that there should be a later end date, concluding that ARS "was up and running and fully operational" as of October 31, 2012, as evidenced by the fact that "you have still been operating out of the 'temporary' offices and that the location of the offices had no impact on your operations and the business was resumed." [Filing No. 46-8 at 4.]

ARS sued Peerless in state court in October 2014, requesting a declaratory judgment regarding the insurance dispute at issue. [Filing No. 1-2.] Peerless removed ARS's action to federal court in November 2014, alleging that this Court could exercise diversity jurisdiction over

---

[2] The letter also informed Mr. Hale that Peerless would pay $6,714 for the 30 consecutive days following the date ARS resumed operations from November 1, 2012 through November 30, 2012 pursuant to the Extended Period of Indemnity. [Filing No. 46-8 at 4.] ARS's entitlement to extended indemnity coverage or the amount it was paid are not at issue on summary judgment.

ARS's action.[3]  [Filing No. 1.]  Both parties have moved for summary judgment, [Filing No. 46;

Filing No. 53], and those motions are now ripe for this Court's review.

### III.
#### DISCUSSION

The parties' cross-motions for summary judgment present a very narrow issue; namely,

whether there is no genuine dispute as to any material fact, such that Peerless correctly determined

the end date for the Period of Restoration as a matter of law when determining ARS's business

income coverage.  Before addressing this issue, the Court will set forth the generally applicable

law for interpreting insurance policies.

### A.  Generally Applicable Insurance Law

When the Court exercises diversity jurisdiction over an action, it is "obliged to apply state

law to the substantive issues in the case."  *Lodholtz v. York Risk Servs. Grp., Inc.*, 778 F.3d 635,

639 (7th Cir. 2015) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938)).  The parties do not

dispute that Indiana law governs this action.  Accordingly, this Court must "apply the law that

would be applied by the Indiana Supreme Court."  *Lodholtz*, 778 F.3d at 639.  "If the Indiana

Supreme Court has not spoken on the issue, [the Court] generally treat[s] decisions by the state's

intermediate appellate courts as authoritative, unless there is a compelling reason to think that the

state supreme court would decide the issue differently."  *Id.*

The Indiana Supreme Court has summarized the well-established standards for interpreting

insurance policies in Indiana as follows:

> Interpretation of an insurance policy presents a question of law that is particularly
> suitable for summary judgment.  It is well settled that where there is ambiguity,
> insurance policies are to be construed strictly against the insurer and the policy
> language is viewed from the standpoint of the insured.  This is especially true where

---

[3] The parties have filed a Joint Jurisdictional Statement, [Filing No. 20], which the Court has
accepted as sufficient to establish diversity jurisdiction, [Filing No. 19].

the language in question purports to exclude coverage. Insurers are free to limit the coverage of their policies, but such limitations must be clearly expressed to be enforceable. Where provisions limiting coverage are not clearly and plainly expressed, the policy will be construed most favorably to the insured, to further the policy's basic purpose of indemnity. Where ambiguity exists not because of extrinsic facts but by reason of the language used, the ambiguous terms will be construed in favor of the insured for purposes of summary judgment.

*State Auto. Mut. Ins. Co. v. Flexdar, Inc.*, 964 N.E.2d 845, 848 (Ind. 2012) (citations and quotations omitted).

The Court will "construe the insurance policy as a whole and consider all of the provisions of the contract and not just the individual words, phrases, or paragraphs." *West Bend Mut. Ins. Co. v. U.S. Fid. & Guar. Co.*, 598 F.3d 918, 921 (7th Cir. 2010) (applying Indiana law). Words are given their ordinary meaning, though where ambiguity exists the policy is read "strictly against the insurer." *Id.* Ambiguous language in the policy is resolved in favor of the insured as long as such an interpretation harmonizes the provisions of the contract as a whole. *Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co.*, 983 N.E.2d 574, 578 (Ind. 2013). Failure to define a term in the policy "does not necessarily make that term ambiguous, nor does a simple disagreement about the term's meaning." *Id.* (citation omitted). "Rather, an ambiguity exists where the provision is susceptible to more than one reasonable interpretation." *Id.*

## B. Period of Restoration End Date

The parties' arguments hinge on their positions regarding whether ARS's move to the Fortville location on October 31, 2012 constituted "a new permanent location," such that the Period of Restoration ended for purposes of ARS's business income coverage. They also dispute whether the term "new permanent location" is ambiguous. The Court will address these arguments in turn.

12

1) "New Permanent Location"

a) *Disputed Phrase is Unambiguous*

The parties dispute whether the phrase "new permanent location" is ambiguous. Peerless contends that it is not. [Filing No. 61 at 3.] ARS disagrees, citing various "questions" that allegedly remain about the language.[4]  [Filing No. 59 at 10.] The questions ARS presents, however, are case-specific factual inquiries based on the parties' conduct after the Ford Drive fire. [*See, e.g.*, Filing No. 59 at 10 ("if Liberty/Peerless asserted that the POR ended on November 1, 2012, then why didn't either follow up with a formal notice to the insured memorializing as much?").] Thus, to the extent that ARS believes that the phrase "new permanent location" is ambiguous because of the parties' conduct and subsequent disagreement regarding the proper interpretation of that phrase, the Court rejects that argument because "[e]xtrinsic evidence cannot be used to create an ambiguity." *Bar Plan Mut. Ins. Co. v. Likes Law Office, LLC*, 44 N.E.3d 1279, 1285 (Ind. Ct. App. 2015). Instead, an ambiguity only exists when "by reason of the language used" in the policy, "the provision is susceptible to more than one reasonable interpretation." *Holiday Hosp. Franchising, Inc.*, 983 N.E.2d at 578; *State Auto*, 964 N.E.2d at 848.

ARS does not detail how the phrase "new permanent location" is allegedly susceptible to more than one reasonable interpretation, and the Court concludes it is not. Instead, the phrase "new permanent location" is not ambiguous because it clearly conveys the commonly understood meaning—namely, that the location is new and not temporary. *See Shore Pointe Enterprises, LLC v. Michigan Millers Mut. Ins. Co.*, 2004 WL 2914131, at *1 (Mich. Ct. App. 2004) ("It is manifest

---

[4] The Court notes that twice in its brief, ARS actually states that the language is unambiguous. [Filing No. 59 at 6 ("each party asserts that the relevant policy language is unambiguous"), at 8 ("[t]he contract terms 'new, permanent location' are not ambiguous").] The Court will err on the side of caution, however, and address any argument ARS makes regarding potential ambiguity of the phrase at issue.

that the commonly understood meaning of 'permanent location' is a location that is not merely temporary."). Because the language "new permanent location" is not ambiguous, the Court will give it its plain meaning. *See* Merriam-Webster Dictionary, available at www.merriam-webster.com (defining the word "permanent" as "lasting or continuing for a very long time or forever; not temporary or changing" and the word "location" as "a place or position") (last visited March 22, 2016).

### b) Effect of Unambiguity of Phrase

The Court's conclusion that the disputed phrase is unambiguous affects the parties' arguments regarding what the parties or their agents knew or said concerning the effect of ARS's move on October 31, 2012. When the language of the insurance contract is unambiguous, "the parties' intent is to be determined by reviewing the language contained within the four corners of the contract, and parol or extrinsic evidence is inadmissible to expand, vary, or explain the instrument unless there has been a showing of fraud, mistake, ambiguity, illegality, duress or undue influence." *Bar Plan Mut.*, 44 N.E.3d at 1285 (citation omitted). No party has argued that one of these exceptions applies. Thus, Peerless' arguments regarding testimony from Mr. DeCesare that he told Mike that moving all of ARS's operations to the Fortville property would terminate the Period of Restoration on that date—a conversation that Mike vehemently disputes—is irrelevant. In other words, even if Mr. DeCesare did convey his interpretation of the policy to Mike, that interpretation is not controlling because the disputed phrase at issue is unambiguous.

As for the alleged admissions by Mike and his insurance agent, Mr. French, the Court finds that they are not as clear or persuasive as Peerless suggests. First, Peerless emphasizes that in response to Mr. DeCesare's inquiry asking Mike "[t]he exact date at which your business was resumed at the new owned location," Mike answered "100% Nov. 01, 2012." [Filing No. 52-4 at

1.]  Even if that statement is admissible as a party admission, it is not at odds with the Court's ultimate conclusion because it is not disputed that ARS "owned" the entire Fortville property.  In other words, Mike's response that 100% of ARS's operations were resumed at the "new *owned* location" on November 1, 2012, was true, but it is still not evidence of the permanence of the ARS's set up on that date.  Likewise, Mr. French's request that Mr. DeCesare "view [the POR interpretation] differently" is not relevant or persuasive on the key issue.  [Filing No. 52-7 at 1.] It was clear by May 2014 when that email was sent that the parties disputed the proper Period of Restoration end date.  Mr. French's acknowledgement of that dispute and advocacy for his client's position is neither surprising nor significant.

2) Effect of Move on October 31, 2012

Because the policy language at issue is not ambiguous, the Court must now determine whether it can conclude as a matter of law that there is no genuine dispute as to any material fact regarding whether ARS moved into its "new permanent location" on October 31, 2012 (Peerless' position), or more than twelve months after the fire (ARS's position).

ARS argues that on October 31, 2012, it "was still operating from scattered temporary locations, and not in a 'new permanent location.'"  [Filing No. 48 at 23.]  ARS points to the logistical difficulties it had in those various buildings and emphasizes that it did not consolidate its operations into the North Building—its new permanent location—until January 2015.  [Filing No. 48 at 23-26.]  Thus, ARS argues that the proper Period of Restoration end date is twelve consecutive months after the fire on Ford Drive, and it should be granted summary judgment in its favor on that issue.  [Filing No. 48 at 27 ("ARS is entitled to a partial summary judgment concluding that the POR on its fire loss exceeded the twelfth month post-loss date of May 17, 2012").]

15

Peerless argues that ARS's move to the Fortville location ended the Period of Restoration because it is undisputed that even before the Ford Drive fire, ARS intended for the Fortville location to be its new permanent location. [Filing No. 53 at 9.] Peerless emphasizes that all of the buildings on the Fortville property have the same address. [Filing No. 53 at 10.]

The undisputed evidence is that the Fortville property consisted of five buildings and that, even before the fire, it was Mike's intention to build offices off the largest building "so that we [ARS] were all in one location." [Filing No. 52-1 at 5.] He did not plan to use the other buildings on the Fortville property for ARS operations; instead, he planned to demolish, move, or rent them out. [Filing No. 52-1 at 5.] The undisputed evidence shows that after the Ford Drive fire and after ARS's lease at the Cumberland facility was terminated, Mike emailed Mr. DeCesare to propose that ARS move into the temporary space on the Fortville property so that ARS and the insurer could "focus [their] resources on expediting the occupancy of ARS's future permanent location . . . ." [Filing No. 46-2 at 1.] ARS's move to those temporary buildings occurred on October 31, 2012. Peerless has presented no evidence that at any time, ARS intended to permanently stay in the buildings on the Fortville property to which it moved on October 31, 2012.

The Court agrees with Peerless that ARS's operations need not have reached pre-loss productions levels for the Period of Restoration to end. [Filing No. 53 at 14-16 (collecting cases).] The portion of the Period of Restoration definition at issue states that it ends "when business is *resumed* at a new permanent location." [Filing No. 46-7 at 2 (emphasis added).] As other courts have held, "there is no quantitative aspect of the definition" of business. *See Shaw Mortgage Corp. v. Peerless Ins. Co.*, 615 F. Supp. 2d 1172, 1177 (S.D. Cal. 2009) ("Under its ordinary meaning, 'business' generally means 'trade' or 'commercial transactions'—there is no quantitative aspect to the definition. Nowhere does the Policy define 'business' as meaning 'business at the same

volume as before.'"); *see also Cincinnati Ins. Co. v. Washer & Refrigeration Supply Co.*, 2008 WL 4600560, at *10 (S.D. Ala. 2008) (noting that "'resume' is not defined in the policy and its ordinary meaning does not imply a return to the previous level of business.  Webster's defines 'resume' as 'to assume or take again: put on anew; reoccupy' and 'to recommence something (as a discourse, work, business) interrupted: go on again after an interruption.'  Thus, to 'resume' operations does not require that the business be as prosperous as before, just that the business is operating again.") (citation omitted).  While the internal communication difficulties ARS had being situated in the temporary buildings on the Fortville property are additional evidence of the temporary nature of that set up, any adverse effect on ARS's volume of business does not necessarily extend the Period of Restoration end date.

Based on the undisputed evidence, the Court concludes that no genuine issue of material fact exists regarding the effect of ARS's temporary move into some of the buildings on the Fortville property on October 31, 2012.  Significantly, there is no evidence that the buildings into which ARS moved on that date were anything but a temporary location until renovation of the North Building was complete.  The fact that the temporary buildings ARS occupied at that time had the same address as ARS's future permanent location is irrelevant.  [Filing No. 46-7 at 2.] Given that there is no evidence that ARS intended to stay in the temporary buildings on the Fortville property, the Court agrees with ARS that, as a matter of law, its move to the temporary buildings in Fortville did not end the Period of Restoration.

ARS argues that such a conclusion entitles it to summary judgment in its favor on a Period of Restoration end date more than twelve months after the Ford Drive fire because it is undisputed that ARS did not move into the North Building until January 2015.  [Filing No. 46-1 at 8.]  The Court cannot jump to that conclusion as a matter of law based on the current record.  The insurance

policy at issue provides that Peerless "will pay for the actual loss of Business Income you sustain due to the *necessary* 'suspension' of your 'operations' during the 'period of restoration.'" [Filing No. 46-6 at 1 (emphasis added).] Peerless cites evidence that at least some of the delay in ARS's final move into the renovated North Building was because Mike had trouble making up his mind regarding the plans and configuration of ARS's permanent home. [*See* Filing No. 52-1 at 15 (Mike attesting in response to a question regarding why he didn't hire a construction manager sooner that "I couldn't decide how I wanted to build-out the offices. I had one plan that I had a price on to begin with and then I changed it . . . for good reasons.").] Thus, perhaps it was not necessary for the Period of Restoration to last twelve consecutive months after the Ford Drive fire. Because the parties do not address the possible effect of this delay, the Court cannot conclude as a matter of law that the Period of Restoration exceeds twelve consecutive months after the Ford Drive fire.

For all of the reasons stated herein, the Court grants summary judgment in favor of ARS to the extent that it concludes that the Period of Restoration end date was not November 1, 2012. It denies summary judgment, however, on whether the Period of Restoration end date is twelve consecutive months after the Ford Drive fire.

### C. Additional Issues

At the end of its opening brief, ARS includes a "summary" that cursorily lists various issues in one-sentence bullet points. [Filing No. 48 at 26-27 (listing various alleged mistakes Mr. DeCesare made during the claim negotiation process and summarily asserting "[u]nreasonable delay and bad faith").] Because ARS did not develop arguments or cite case law or evidence in support of these bullet points, it has waived any arguments contained therein for purposes of summary judgment. *See Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) (holding that where a party fails to develop the factual basis of a claim and instead "merely

18

draws and relies upon bare conclusions, the argument is deemed waived").  ARS again briefly raises one of these issues at the end of its reply brief, contending that "[t]he appraisal process provided for in the policy calls for alternative dispute resolution if a dispute exists as to the amount of the loss."  [Filing No. 59 at 10.]  Although it cites no authority in support of its position, ARS argues that "the procedural solution is to stay this action pending the outcome of the appraisal process," which ARS contends it timely invoked.  [Filing No. 59 at 10.]

In its cross-reply brief, Peerless argues that ARS waived its right to appraisal by litigating this matter for more than ten months before demanding appraisal.  [Filing No. 61 at 9.]  Peerless cites cases in support of its position and contends that it would be prejudiced if ARS is allowed to untimely demand appraisal.  [Filing No. 61 at 10.]  Peerless concludes that even if ARS has not waived its right to appraisal, the appraisal panel only considers factual disputes related to the amount of loss, not the scope of coverage provided by the policy.  [Filing No. 61 at 10.]

Assuming for the sake of the argument that ARS has not waived the appraisal issue by failing to develop a cogent argument about it on summary judgment, the Court concludes that it has waived it by waiting until almost a year after commencing litigation to request it.  *See, e.g.*, *Cypress Pointe at Lake Orlando Condo. Ass'n, Inc. v. Mt. Hawley Ins. Co.*, 2012 WL 6138993, at *2 (M.D. Fla. 2012) ("A party that fails to seek appraisal within a reasonable time after the commencement of litigation waives its appraisal right by acting inconsistently with that right."). Waiver notwithstanding, the Court agrees with Peerless that the scope of coverage at issue herein "is a purely legal issue that cannot be determined by an appraisal, which is limited to factual disputes over the amount of loss for which an insurer is liable." *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (collecting cases); *see also Indian Chef, Inc. v. Fire & Cas. Ins. Co.*, 2003 WL 329054, at *3 (S.D.N.Y. 2003) ("A dispute between the parties

19

that goes to coverage under the policy and can only be resolved by analysis and application of the policy is not appropriate for appraisal."); *see also Turnstone Consulting Corp. v. U.S. Fid. & Guar. Co.*, 2007 WL 1430033, at *4 (N.D. Cal. 2007) ("The appraisal panel's role is only to determine the monetary value of the interruption to plaintiff's business.  The panel's role is not to determine whether the policy covers that interruption.").  Thus, even if ARS did not waive the appraisal issue, the Court concludes that the scope of coverage at issue herein is a purely legal question that cannot be determined by an appraisal.

## IV.
### CONCLUSION

For the reasons stated herein, the Court **GRANTS IN PART AND DENIES IN PART** ARS's Motion for Partial Summary Judgment, [Filing No. 46], and **DENIES** Peerless' Cross-Motion for Summary Judgment, [Filing No. 53].  A final pretrial and bench trial will occur as scheduled, with the Court issuing a separate final pretrial order setting deadlines at the appropriate time.  The Court further requests that the magistrate judge confer with the parties about a possible agreed resolution of the case.


Date:  March 22, 2016

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana


**Electronic Distribution via CM/ECF:**

Gary P. Price
BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
gprice@beneschlaw.com

20

Peter S. French
BENESCH, FRIEDLANDER, COPLAN & ARONOFF,
LLP pfrench@beneschlaw.com

Peter Emanuel Kanaris
FISHER KANARIS PC
pkanaris@fisherkanaris.com

Cheryl L. Mondi
FISHER KANARIS, P.C.
cmondi@fisherkanaris.com

Nicole M. Gallagher
FISHER KANARIS, P.C.
ngallagher@fisherkanaris.com

Grover Burton Davis
MCCLURE MCCLURE & DAVIS
gbdavis@mmdhlaw.com